NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CARMINE D'ANDREA and JENNIFER D'ANDREA,<br><br>    Plaintiffs,<br><br>  v.<br><br>RONALD ALBERT GELOK, JR.;<br>RONALD GELOK AND ASSOCIATES<br>LLC; "ABC CORPORATIONS 1-10"<br>(Fictitious Names); and "JOHN<br>DOE/JANE DOE 1-10" (Fictitious Names),<br><br>    Defendants. | Civil Action No. 22-00491 (GC)<br><br><br><br>MEMORANDUM OPINION |

**BONGIOVANNI, Magistrate Judge**

Pending before the Court is Plaintiffs, Carmine and Jennifer D'Andrea's ("Plaintiffs"), Cross-Motion to File a First Amended Complaint ("Cross-Motion").  (Docket Entry No. 17.) Plaintiffs filed a Complaint in New Jersey State Court on December 17, 2021 (the "Complaint"). (Docket Entry No. 1.)  Plaintiffs named Ronald Albert Gelok, Jr., Ronald Gelok and Associates LLC, ABC Corporations 1-10, and John Doe/Jane Doe 1-10 as Defendants in the Complaint. (Docket Entry No. 1.)  On February 1, 2022, Defendants Ronald Albert Gelok, Jr., and Ronald Gelok and Associates LLC, ("Defendants") filed a Notice of Removal pursuant to 28 U.S.C. § 1441 & § 1446.  (*Id.*)  Defendants filed a Partial Motion to Dismiss the Complaint ("Motion to Dismiss") on March 10, 2022.  (Docket Entry No. 6.)  On April 25, 2022, Plaintiffs filed an Opposition and a Cross-Motion for leave to file a First Amended Complaint ("Amended Complaint").  (Docket Entry No. 17.)  On May 25, 2022, Defendants filed a Reply in further

support of the Motion to Dismiss together with an Opposition to the Cross-Motion. (Docket Entry No. 20.)

In light of Plaintiffs' Cross-Motion to Amend, on June 22, 2022, the District Court administratively terminated the Motion to Dismiss pending resolution of the Cross-Motion. (Docket Entry No. 23.) The Court preserved Defendants' right to re-file the Motion to Dismiss following the disposition of the Cross-Motion. (*Id.*) On July 7, 2022, the Cross-Motion was referred to this Court for Its consideration. The Court has fully reviewed and considered all arguments for and against Plaintiffs' Cross-Motion. The Court considers the Cross-Motion without oral argument pursuant to L.Civ.R. 78.1(b).

## I.        Background and Procedural History

In 2015, Plaintiffs attended a lunch seminar hosted by the Defendants during which they met with Mr. Gelok to discuss their interest in investing their retirement funds. (Docket Entry No. 17.) Plaintiffs sought professional investment advice to allegedly assist them with understanding, managing, and purchasing investments. (*Id.*) Plaintiffs claim they repeatedly expressed and advised Mr. Gelok that they were relatively low risk investors with the objective of protecting principal and generating income. (*Id.*) In the Complaint, Plaintiffs allege they were persuaded to transfer their funds to Mr. Gelok based on his promises to generate income while limiting/deferring taxes and protecting investment principal. (*Id.*)

Plaintiffs claim that Mr. Gelok is a registered investment advisor with the U.S. Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA"). (*Id.*) As a registered investment advisor, Plaintiffs argue that Mr. Gelok owes his clients, including Plaintiffs, a fiduciary duty under the U.S. Investment Advisor Act, 15 U.S.C. § 80B – 1, et seq. and/or other applicable laws, rules, and standards. (*Id.*) Additionally, Plaintiffs argue that Ronald

Gelok and Associates LLC, is required to file a "Firm Brochure" detailing certain aspects of how it will comply with applicable SEC requirements and rules because it is registered with the SEC. (Docket Entry No. 17.)  Despite language in the Firm Brochure indicating that Ronald Gelok and Associates LLC, would require customers to enter into a written agreement identifying the terms and conditions under which Ronald Gelok and Associates LLC, renders its services, Plaintiffs claim that Defendants have failed to produce such a written agreement between them and Plaintiffs.  (*Id.*)  Nonetheless, Plaintiffs argue that the parties entered into an agreement when the parties decided "that, in exchange for certain payments, fees and commissions, Defendants would provide investment advice and recommendations." (*Id.*)  Plaintiffs further assert that the parties "affirmatively agreed that, in exchange for receiving payments and/or commissions, Gelok would act as a fiduciary and in their best interest." (*Id.*)

In the Complaint, Plaintiffs allege that in or about 2015, Mr. Gelok recommended that Plaintiffs invest $200,000 in a Midland National Life Insurance Company Flexible Premium Deferred Annuity, Contract No. XXXXXX6311 ("Midland Annuity").  (Docket Entry No. 1.) Plaintiffs also allege that in or about 2018, Mr. Gelok recommended that Plaintiffs purchase an Indexed Universal Life Insurance Policy from Minnesota Life Insurance Company, Policy No. XXXX755W ("Minnesota Policy").  (*Id.*)

The Minnesota Policy was originally funded with $200,000 from Plaintiffs' retirement savings.  (*Id.*)  Plaintiffs allege that they were "shocked to learn that they incurred approximately $90,000 in additional tax liability in connection with the purchase of the Minnesota Policy." (Docket Entry No. 17.)  To cover the tax liability, Plaintiffs claim they "were forced to take out a second mortgage on their home." (*Id.*)  Every year since the initial purchase of the Minnesota Policy, Plaintiffs allege to have received notices that additional premiums were needed to maintain

the Minnesota Policy. (*Id.*) At Mr. Gelok's instruction, Plaintiffs claim to have paid an additional $50,000 into the Minnesota Policy to stop it from lapsing in 2019 and have incurred approximately $20,000 in additional tax liability as a result of withdrawing $50,000 out of their retirement account to further fund the Minnesota Policy. (*Id.*) Plaintiffs estimate that to date, they have spent $250,000 in premiums for the Minnesota Policy and incurred another $110,000 in tax liability from withdrawals to fund the Minnesota Policy. (*Id.*) In 2020, Plaintiffs claim that Mr. Gelok provided three proposals to save parts of the Minnesota Policy, one of the proposals included a recommendation by Mr. Gelok to Plaintiffs to pay an additional $80,000. (*Id.*) Plaintiffs claim that "[a]s a direct and proximate cause of Gelok's wrongful actions," Plaintiffs will lose their premium payments of $250,000 and have incurred another $110,00 in tax liability. (Docket Entry No. 17.)

As a result of Defendants' alleged conduct, Plaintiffs filed a Complaint asserting the following ten counts: Count One – Violation of Federal Securities Laws; Count Two – Violation of State Securities Laws; Count Three – Breach of Fiduciary Duty; Count Four – Negligence; Count Five – Misrepresentation; Count Six – Breach of Contract; Count Seven – *Respondeat Superior*; Count Eight – Failure to Supervise; Count Nine – Fraud; and Count Ten – Consumer Fraud. (Docket Entry No.1.) Defendants' Motion to Dismiss argues that Counts One, Two, Five, Nine, and Ten of Plaintiffs' Complaint should be dismissed for lack of particularity. (Docket Entry No. 6.) The Motion to Dismiss also raises a Statute of Limitations defense as to Plaintiffs' claims arising from the Midland Annuity, purchased in 2015. (*Id.*) Additionally, Defendants allege that Plaintiffs fail to state a claim for Count Six and argue that Count Ten should be dismissed because the Consumer Fraud Act is inapplicable to Defendants. (*Id.*)

4

In response to the Motion to Dismiss, Plaintiffs' Cross-Motion argues that the claims in the Complaint are not time barred because every claim arises from the Minnesota Policy purchased in 2018, rather than the Midland Annuity purchased in 2015. (Docket Entry No. 17.) Despite filing the Motion to Amend, Plaintiffs deny Defendants' assertion that certain claims have not been pled with particularity. (*Id.*) Additionally, Plaintiffs reassert that Defendants breached their contract with Plaintiffs, even if that contract was an oral agreement, and that Defendants are not exempt from the Consumer Fraud Act. (*Id.*)

In their Reply, Defendants argue Plaintiffs' Amended Complaint "does not cure the defects in the Complaint." (Docket Entry No. 20.) Defendants contend Plaintiffs conceded that claims related to the Midland Annuity are time-barred, and that even if the claims arise solely out of the Minnesota Policy, the federal and state securities claims are still time barred. (*Id.*) They state that even if Plaintiffs are permitted to amend the Complaint, "all references to the Midland Annuity, or any other 'investments' besides the Minnesota Policy, should be stricken from such pleading." (*Id.*) As argued in their opening brief on the Motion to Dismiss, in their Reply, Defendants reassert that the breach of contract claim is insufficiently pled and that the Consumer Fraud Act does not apply. (*Id.*)

On May 26, 2022, Plaintiffs filed a letter on the docket arguing that Defendants' Reply contained misstatements and requested leave to file a short sur-reply or address the issues at oral argument. (Docket Entry No. 21.) The District Court denied Plaintiffs' request on June 3, 2022. (Docket Entry No. 22.) The Court advised that It would request additional briefing if it was deemed necessary after reviewing the parties' submissions. (*Id.*) On June 22, 2022, the Court administratively terminated the pending Motion to Dismiss in light of the pending Cross-Motion to Amend. (Docket Entry No. 23.) This Court now addresses Plaintiffs' Cross-Motion to Amend.

## II.    Analysis

Pursuant to Rule 15(a)(2), leave to amend pleadings is generally granted freely.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000). Nevertheless, the Court may deny a motion to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment."  *Foman*, 371 U.S. at 182; *see Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2002).  However, where there is an absence of undue delay, bad faith, prejudice or futility, a motion for leave to amend a pleading should be liberally granted.  *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004).

An amendment is futile if it "is frivolous or advances a claim or defense that is legally insufficient on its face."  *Harrison Beverage Co. v. Dribeck Imp., Inc.*, 133 F.R.D. 463, 468 (D.N.J. 1990) (citation omitted).  To determine if an amendment is "insufficient on its face," the Court utilizes the motion to dismiss standard under Rule 12(b)(6), *see Alvin*, 227 F.3d at 121, and considers only the pleading, exhibits attached to the pleading, matters of public record, and undisputedly authentic documents if the party's claims are based upon same.  *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

To determine if a complaint would survive a motion to dismiss under Rule 12(b)(6), the Court must accept as true all the facts alleged in the pleading, draw all reasonable inferences in favor of the plaintiff, and determine if "under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). "[D]ismissal is appropriate only if, accepting all of the facts alleged in the [pleading] as true, the p[arty] has failed to plead 'enough facts to state a claim to relief that is plausible on its face.'"

*Duran v. Equifirst Corp.*, Civil Action No. 2:09-cv-03856, 2010 WL 918444, *2 (D.N.J. March 12, 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Simply put, the alleged facts must be sufficient to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Additionally, in assessing a motion to dismiss, while the Court must view the factual allegations contained in the pleading at issue as true, the Court is "not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).

"Given the liberal standard for the amendment of pleadings, 'courts place a heavy burden on opponents who wish to declare a proposed amendment futile.'" Therefore, '[i]f a proposed amendment is not clearly futile, then denial of leave to amend is improper.'" *Marina Dist. Dev. Co. LLC v. AC Ocean Walk LLC*, No. 120CV15719NLHKMW, 2021 WL 1526552, at *3 (D.N.J. Apr. 19, 2021) (first quoting *Brainbuilders, LLC v. Optum, Inc.*, No. 18-638, 2019 WL 2315389, at *5 (D.N.J. May 31, 2019); then quoting *High 5 Games, LLC v. Marks*, No. 13-7161, 2017 WL 349375, at *5 (D.N.J. Jan. 24, 2017); and then citing 6 Wright, Miller & Kane, *Federal Practice and Procedure* § 1487 (3d ed. 2012)).

Notably, "[p]laintiffs routinely amend complaints to correct factual inadequacies in response to a motion to dismiss." *W. Run Student Hous. Assocs., LLC v. Huntington Nat. Bank*, 712 F.3d 165, 172 (3d Cir. 2013) (citing 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1474 (3d ed. 2008)). Here, in response to Defendants' Motion to Dismiss, Plaintiffs made several amendments to the Complaint of varying significance. Plaintiffs' most significant addition to the Amended Complaint is limited to the "Facts Common to All Counts" portion of the Complaint. (Docket Entry No. 17.) Plaintiffs also add a paragraph

to Count One – Violation of Federal Securities Laws, two paragraphs to Count Six – Breach of

Contract, and one paragraph to Count Nine – Fraud, and make grammatical alterations to language

used throughout the Complaint, Plaintiffs make no other substantive changes to Counts One

through Ten in the Amended Complaint.  (*Id.*)  It is evident in the Cross-Motion that Plaintiffs

intended to correct any inadequacies identified by Defendants in the Motion to Dismiss.

Among the changes identified above, Plaintiffs seek to add the following statements to the

"Facts Common to All Counts" portion of the Complaint:

> 11. In 2015, the D'Andreas attended a lunch seminar hosted by Gelok and his firm, Gelok LLC.

> 18. Gelok undertook to provide broad financial advisory and tax services to the D'Andreas. These services included, without limitation, retirement planning, asset allocation, tax planning, management of retirement funds, and investment recommendations.

> 19. The D'Andreas trusted and relied upon Gelok as their financial advisor for all of their financial and retirement planning.

> 20. As Gelok LLC is registered with the SEC, it is required to file a "Firm Brochure" detailing certain aspects of how it will comply with applicable SEC requirements and rules.

> 21. In the Firm Brochure filed annually by Gelok LLC with the SEC, Gelok Associates affirmed that it would require its customers to "enter into one or more written agreements with [Gelok LLC] setting forth the terms and conditions under which [Gelok LLCs] renders its services."

> 22. Despite the requirement to enter into written agreements with customers, Gelok and Gelok LLC have failed to produce such a written agreement between them and the D'Andreas.

> 23. Gelok's failure to execute the required agreement and/or failure to produce the agreement does not absolve Defendants' (*sic*) of the contractual obligations that they undertook with respect to the D'Andreas.

> 26. Gelok and the D'Andreas' further affirmatively agreed that, in exchange for receiving payments and/or commissions, Gelok would act as a fiduciary and in their best interest.

29. In or about mid-2017, Gelok first approached the D'Andreas about purchasing the Minnesota Policy.

34. In order to induce the D'Andreas to purchase the Minnesota Policy, Gelok advised the D'Andreas, among other things, that the policy was a "tax free alternative" that would generate $40,000 a year in guaranteed income through loans against the policy and a death benefit in excess of $2 million. These statements were made in meetings between the parties prior to the policy being issued. Gelok knew this was not true because, among other things, the D'Andreas would incur significant tax liability to purchase the Minnesota Policy. Gelok willfully made these misrepresentations to induce the D'Andreas to purchase the Minnesota Policy.

35. Gelok promised and assured the D'Andreas that the Minnesota Policy was a long-term solution for their retirement and that the Minnesota Policy would remain in place.

36. The D'Andreas had virtually no understanding of indexed universal life products, the application process to obtain such policies, and the terms of such policies.

37. The D'Andreas relied on Gelok's advice and recommendations entirely when they agreed to purchase the Minnesota Policy, including but not limited to the application process and the selection of policy terms. Gelok intentionally took advantage of this relationship of trust to enrich himself at the D'Andreas expense.

38. On or about October 3, 2017 and October 10, 2017, Gelok (or his representative) completed applications and related documents for the Minnesota Policy.

39. In applications and related documents completed in October 2017, Gelok stated that Ms. D'Andrea had a liquid net worth of 2.6 million, which was untrue. This amount was wildly overstated for the D'Andreas combined, much less just Ms. D'Andrea.

40. The D'Andreas did not receive and/or review the information provided on the forms by Gelok prior to the Minnesota Policy being issued.

41. Gelok willfully and intentionally overstated the amount of Ms. D'Andrea's income and liquidity to obtain approval for the Minnesota Policy. If Gelok had provided the correct information, the Minnesota Policy would have never been issued because, among other things, the D'Andreas could not afford the premiums.

42. Gelok knew these numbers were inaccurate as all of the D'Andreas' investable assets were with Gelok.

43. The Minnesota Policy was issued on or about January 18, 2018.

56. In August 2020, as well as at other times, Gelok continued to advise the D'Andreas to maintain, hold and further fund the Minnesota Policy.

57. On August 7, 2020, Gelok (though his representative) sent an email proposing three alternatives to attempt to save parts of the Minnesota Policy. Out of the three alternatives proposed on August 7, 2020, the one recommended by Gelok would have required the D'Andreas to pay an additional $80,000 in premiums. However, even if this payment was made, the projected income benefit starting at age 73 would have been only $4,270 annually with a death benefit of $181,131 at age 85.

58. The D'Andreas did not have an additional $80,000 to put into the Minnesota Policy as recommended by Gelok.

59. Gelok was recommending that they invest and spend a total of $440,000 ($250,000 in prior premiums, $110,000 in tax liability, plus an $80,000 in additional premiums) for negligible income and death benefits.

60. In order to induce the D'Andreas to purchase the Minnesota Policy, Gelok advised the D'Andreas prior to purchase, among other things, that the policy was a long - term solution for their retirement and that the Minnesota Policy would remain in place. These statements were untrue. Gelok willfully made these misrepresentations to induce the D'Andreas to purchase the Minnesota Policy.

63. As a direct and proximate cause of Gelok's wrongful actions, the Minnesota Policy will lapse with no benefit to the D'Andreas

85. The D'Andreas will lose their premium payments of $250,000 and have incurred another $110,000 in taxes in connection with funding the Minnesota Policy.

87. The purchase of the Minnesota Policy, combined with the D'Andreas' prior purchase of the Midland Annuity, overly concentrated the D'Andreas in insurance and annuity products.

88. One of the consequences of the over concentration in insurance products and annuities is/was a lack of liquidity necessary to pay and maintain the premiums on the Minnesota Policy, as well as pay other expenses.

90. The D'Andreas did not become aware of the Defendants' violations of applicable security laws until at least 2020.

91. In August 2020, as well as at other times, Gelok continued to advise the D'Andreas to maintain, hold and further fund the Minnesota Policy.

92. The D'Andreas continued to trust and rely on Gelok's advice for years, and did not begin to learn that he had made misrepresentations and otherwise acted improperly until 2020.

93. The D'Andreas did not learn that Gelok had overstated their "liquid" net worth in order to obtain the policy until 2021.

94. The D'Andreas reliance on Gelok was reasonable given the parties' relationship of trust and Gelok's continued advice.

95. In addition to the parties' contractual relationship, their relationship was governed by and subject to, among other things, SEC rules and regulations, FINRA rules and regulations, common law tort principles, and state and federal securities laws.

(Docket Entry No. 17.)

The Court finds that with the addition of the statements above in the Amended Complaint, in conjunction with the liberal amendment standards, the elements of each claim has been sufficiently plead such that the proposed amendments are not clearly futile.

Additionally,

The crux of Defendants' opposition is that the proposed amendments would not cure the Complaint's defects and any additional claims would be futile. Based on the nature of the futility analysis, Defendants' arguments in opposition to the motion to amend would overlap significantly with the arguments made in support of [the] motion to dismiss. The Court, in its discretion, will not consider these arguments in connection with its review of the motion for leave to amend. In the interests of judicial economy and in the absence of undue prejudice, the Court may decline to engage in a detailed futility analysis where the Court finds that these arguments are better suited for consideration in the context of a motion to dismiss.

*Colombo v. Bd. of Educ. for the Clifton Sch. Dist.*, No. CV 11-0785 (CCC), 2016 WL 6403081, at *2 (D.N.J. Oct. 27, 2016) (citation omitted).

As a result, Plaintiffs Cross-Motion is **GRANTED**. Defendants' right to respond to the Amended Complaint in whatever manner they see fit is preserved. Defendants are directed to file that response according to the timeframe set forth in the Federal Rules of Civil Procedure.

Lastly, the Court addresses Defendants' Statute of Limitations Defense as it applies to Plaintiffs' Cross-Motion.

> Technically, the Federal Rules of Civil Procedure require a defendant to plead an affirmative defense, like a statute of limitations defense, in the answer, not in a motion to dismiss. In [the Third Circuit], however, we permit a limitations defense to be raised by a motion under Rule 12(b)(6) "only if 'the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.'" However, "'[i]f the bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6).'"

*Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (citations omitted).

Therefore, "[t]he statute of limitations will support dismissal under Rule 12(b)(6) only in the very clear case where a plaintiff has pled itself out of court." *Allegheny Plant Servs. v. Carolina Cas. Ins. Co.*, No. 14-4265, 2017 U.S. Dist. LEXIS 119310, 2017 WL 3234379, at *4 (D.N.J. July 28, 2017). Here, Defendants' Statute of Limitation Defense involves a dispute over the interpretation of facts. Both Defendants and Plaintiffs agree that Plaintiffs' federal security claims are subject to a statute of limitation. (*See* Docket Entry Nos. 6 and 17.) Specifically, the parties agree that federal security claims "may be brought not later than the earlier of: (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). Likewise, both parties agree that state security claims are subject to a two-year statute of limitation. (Docket Entry Nos. 6 and 17.) Particularly, under N.J.S.A. § 49:3-71(g), "[n]o person may bring an action under this section more than two years after the contract of sale or the rendering of the investment advice, or more than two years after the time when the person aggrieved knew or should have known of the existence of his cause of action, whichever is later."

The parties, however, disagree as to the application of the aforementioned statutes of limitations to this case. Defendants argue that the Midland Annuity, purchased in 2015, is barred by the statute and that all claims related to the Midland Annuity should be denied. (Docket Entry

No. 6.)  Plaintiffs do not deny that the Midland Annuity is barred by the statute of limitations. (Docket Entry No. 17.)  Instead, Plaintiffs contend that none of their federal security claims are time-barred until 2023 because all claims arise out of the Minnesota Policy which was purchased in 2018.  (*Id.*)  Additionally, Plaintiffs argue that they did not discover Defendants' state violations until at least 2020, and "the date that the D'Andreas became aware or should have become aware of Gelok's actions and wrongful conduct is ultimately a question of fact that cannot be disposed by way of a 12b(6) [*sic*] motion."  (Docket Entry No. 17.)

A review of the Amended Complaint for futility identifies the difficulty of analyzing the Statute of Limitations Defense due to Plaintiffs' use of "Midland Annuity and/or Minnesota Policy" to identify both the Midland Annuity and the Minnesota Policy throughout the Amended Complaint.  (*Id.*)  While Plaintiffs argue in the Cross-Motion that every claim arises from the "Minnesota Policy," the Amended Complaint freely refers to both the Midland Annuity and the Minnesota Policy.  (Docket Entry No. 17.)  Given the liberal amendment standard and for the sake of efficiency, this Court grants Plaintiffs' request to amend the Complaint to address Defendants' Statute of Limitation Defense.  In an effort to better understand Plaintiffs' allegations, in addition to the amendments already made, this Court shall require Plaintiffs to specifically identify whether the Midland Annuity or the Minnesota Policy gives rise to each allegation in the Amended Complaint ultimately filed with the Court.  The use of and/or statements are to be avoided.  Further, if a different investment gives rise to a cause of action, Plaintiffs must identify said investment with specificity in the Amended Complaint.  Plaintiffs are directed to refrain from referring to "other investment(s)" or similar non-specific language.

**III.    Conclusion**

For the reasons stated above, Plaintiffs' motion to amend is **GRANTED**.  An appropriate

Order follows.

Dated: September 21, 2022.

s/Tonianne J. Bongiovanni
**HONORABLE TONIANNE J. BONGIOVANNI**
**UNITED STATES MAGISTRATE JUDGE**
